CALE P. HAUN, Complainant-Appellee, v. GUARANTY
SECURITY INSURANCE COMPANY and Hartford
Fire Insurance Company, Defendants-Appellants.
—453 S.W.2d 84.

Middle Section. September 26, 1969.

Rehearing Denied October 31, 1969.

Certiorari Denied by Supreme Court April 6, 1970.

138 

William Waller, of Waller, Lansden, Dortch & Davis, and Boult, Hunt, Cummings & Conners, Nashville, for complainant-appellee.

Dan E. McGugin, of Watkins, McGugin, Stewart, Finch & McNeilly, and David M. Keeble, of Hooker, Keeble, Dodson & Harris, Nashville, for defendants-appellants.

PURYEAR, J. This suit was originally filed by Cale P. Haun, who died while it was pending and it was revived by the executors of his will.

The defendants-appellants are successors in interest to Northwestern Fire and Marine Insurance Company, to which we will sometimes refer in this opinion as "Northwestern."

There is very little controversy about the determinative facts of the case and the issues presented upon this appeal are largely composed of questions regarding the legal conclusions based upon such facts.

The evidence in the record establishes the relevant facts of the case to be briefly, as follows:

On and prior to November 7, 1956, Haun was owner of a certain river Towboat named "John Luchow." Haun was also owner of Tennessee Towing Company, which was later liquidated, with the result that Haun became liable for its obligations. Haun and members of his family owned, either directly or indirectly, at least two other businesses, the insurance on all of which was usually carried by companies represented by the insurance agencies of C. M. Hunt Company and Richards, Scott and Lyle, of Nashville, Tennessee.

A policy covering the "John Luchow" was R.P.I. 13622 naming West Tennessee Limestone Company as assured and it was issued by Northwestern as insurer for the period from October 1, 1956 to October 1, 1957. The letters "R.P.I." stand for "River Protection and Indemnity."

This policy, R.P.I. 13622, was issued as a renewal of R.P.I. 13604. Since one of the main issues involved in this appeal is the extent of the obligations of the insurer under said policy, the pertinent provisions will be quoted and discussed later.

The schedule attached and made a part thereof showed the limits of liability on the John Luchow to be $51,500.00, subject to a provision that the first $250.00 of loss was deductible.

On or about November 7, 1956, the Luchow was delivered to Nashville Bridge Company for installation of a

new engine and remodeling and it remained in the Bridge Company's floating dock for that purpose until on or about December 21st or 22nd of 1956.

Although it was customary for the members of a vessel's crew not to remain on the vessel while it was docked for the purpose of having work done thereon by an independent contractor, such as Nashville Bridge Company, Haun desired to provide work on the vessel for such of the crew members thereof as desired to work during the period of repowering and remodeling of the vessel. Therefore, Haun arranged with Nashville Bridge Company to let these crew members do certain odd jobs that would have otherwise been done by Nashville Bridge Company's employees.

This work included cleaning and repainting surfaces that were made accessible by reason of the remodeling which was being done.

Some of the crew of the vessel went home, one of them quit and others stayed in Nashville to do the work which Haun had arranged with Nashville Bridge Company for them to do. Tennessee Towing Company, which was one of the businesses owned by Haun at the time, kept these crew members on the same payroll at the same weekly wages but instead of working normal six hour shifts with twenty days on duty and ten days off duty they would only work on day shifts and no one was on duty at night.

At the time the Luchow was delivered to Nashville Bridge Company, the Hunt Agency and Richards, Scott and Lyle were notified that it was being docked for the purpose of repowering and remodeling. This is a customary procedure when a vessel is docked for a period of time.

Upon being notified of such repowering and remodeling, the two above mentioned agencies suspended the coverage of R.P.I. 13622 and another policy not pertinent to this appeal and substituted in lieu thereof a builders' risk insurance certificate, which provided for property damage coverage only and did not provide any protection to Haun for loss that might occur as a result of negligent injury to any of the crew members.

Although Haun knew some changes in the insurance coverage were made at the time, he and the Hunt Agency have insisted at all times that neither he nor Hunt ever intended to suspend the coverage which he had against loss or damage by reason of negligent injury to any of the members of the Luchow crew. A member of the vessel's crew at the time it was docked at Nashville Bridge Company was one Clyde Keymon.

The work done by Nashville Bridge Company took approximately forty-four days. During that period of time, O. E. Brown, who was the captain of the vessel, remained in charge of those crew members who elected to stay in Nashville and do the day work and he assigned certain tasks to them.

Keymon did some work on the vessel between November 10 and November 14th, 1956, on which latter date he and another man left Nashvile to take another boat called the "Big Boy" to Helena, Arkansas. They arrived there on December 7th, on which date Keymon proceeded to return to his home at Milan, Tennessee. He later returned to Nashville and did some work on the vessel on both December 21 and 22, on the latter of which dates he went back to Milan because his wife was sick. He subsequently rejoined the vessel at Smithland, Tennessee. On January

11, 1957, at Savannah, Tennessee, Keymon left the vessel and went home sick and later entered the United States Public Health Hospital in Memphis, Tennessee, known as the Marine Hospital.

By endorsement effective January 8, 1957, the indemnity coverage of R.P.I. Policy 13622 was reinstated and increased to a maximum of $112,000.00.

On or about January 10, 1958, Keymon filed suit against Haun and Tennessee Towing Company in the United States District Court at Nashville, alleging in his complaint, that while the John Luchow was at Nashville to be repowered and remodelled, it was discovered upon removal of the old engine that the wall and floors or hold were covered with an accumulation of grease and dirt; that he was ordered by Brown to clean the engine room and hold, using a substance known as Oakite; that in doing this work, his trousers became wet with Oakite solution; that he began to feel a stinging and burning sensation in the area of his groin and his private parts, as a result of having his clothes thus saturated with said strong chemical solution and that as a result thereof he sustained severe and disabling permanent injury.

In Keymon's suit against Haun and the Tennessee Towing Company, he sought recovery of damages against them on the grounds of negligence in failing to provide him with protective clothes or to warn him of the danger of using Oakite and also sought recovery against Haun, the owner of the vessel, on the ground of unseaworthiness.

Keymon subsequently filed an amendment to his complaint seeking additional recovery for maintenance and

cure but this is not pertinent to the issues raised on this appeal.

The trial of the Keymon case in the United States District Court finally resulted in a judgment in his favor for $78,700.00, based upon negligence and unseaworthiness, and $4,300.00 for maintenance and cure, or a total of $83,000.00. The judgment was later affirmed by the United States Sixth Circuit Court of Appeals, and was paid by Haun, 296 F.2d 785.

As soon as Haun became aware that Keymon was making a claim against him, he notified the Hunt Agency of the pendency of such claim and when suit was filed in United States District Court, he sent a copy of the complaint to the Hunt Agency.

By that time, the defendants, Guaranty Security Insurancy Company and Hartford Fire Insurance Company, had become successors in interest to Northwestern Fire and Marine Insurance Company.

It is admitted in the answer filed by the defendants that there was an agreement whereby Hartford reinsured Northwestern and therefore, if there is any liability in this case, it is the liability of Hartford only and therefore, Hartford Fire Insurance Company is the real defendant in this case.

When Hartford received notice that suit had been filed by Keymon, it retained Mr. John L. Quinlan, a New York attorney, and Mr. Norman Minick, a Nashville attorney, to investigate the matter.

This preliminary investigation, which took about four or five days, was made by Mr. Minick and when he made his report, Hartford denied liability upon the grounds

that Haun and Tennessee Towing Company were not named assureds and that the River Protection and Indemnity policy was not in effect at the time of the alleged injury to Keymon.

Upon Hartford denying coverage, Mr. Quinlan and Mr. Minick withdrew from the case, and Haun employed the law firm of Waller, Lansden and Davis of Nashville, Tennessee, to represent him in United States District Court.

These attorneys retained by Haun were in complete charge of conducting his defense to the Keymon suit, although within a few days after Mr. Quinlan withdrew from the case, he was again retained by Hartford to advise and assist Haun's attorneys in defending the Keymon suit in United States District Court.

The case was tried in District Court beginning on July 25, 1960 and was concluded on July 29, 1960, resulting in a verdict and judgment in favor of Keymon, against Haun and Tennessee Towing Company for $83,000.00 as aforesaid.

On February 7, 1961, Haun wrote the Hunt Agency the following letter:

"February 7, 1961

C. M. Hunt Company
Nashville Trust Building
Nashville, Tennessee

Re: Towboat John Luchow- Northwestern Fire & Marine Insurance Company RPI 13622

146

Gentlemen:

On November 26, 1960 you furnished our attorney Mr. Waller, certain information from which it is my understanding that on January 15, 1957, an endorsement was countersigned by C. M. Hunt Company, effective November 11, 1956, cancelling the John Luchow from the schedule of the above policy, in consideration of a return premium of $457.15, and that subsequently an endorsement was countersigned February 8, 1957 returning the John Luchow to the schedule for an additional premium of $816.26, effective January 8, 1957. The limit of liability commencing January 8, 1957 was $112,000. You have subsequently informed Mr. Waller that if the effective date had been November 11, 1956 instead of January 8, 1957, an additional premium would have been due in the amount of $176.81. We figure that interest on this amount at 6% would amount to $55.75, and we are accordingly now handing you our check for $232.56 to include both premium and interest thereon for this protection during the period November 11, 1956 to January 8, 1957.

We ask that the endorsement in question be revised so as to substitute November 11, 1956 for January 8, 1957, and also so as to name specifically Tennessee Towing Company as an insured, as in indemnity insurance Company of North America Policy W.C. 49212.

Tennessee Towing Company and I, as the owner of the John Luchow and the capital stock of Tennessee Towing Company, intended, as you and your underwriter know, that we be given full protection against claims of employees for personal injuries while the vessel was being repowered and remodeled at Nashville Bridge Company and while certain members of the

crew were doing day work on the vessel, such as cleaning the engine room. We feel that you were entirely correct to cover these men with compensation insurance during this period, but the cancellation of the P & I coverage and the failure to make the additional coverage effective November 11, 1956 instead of January 8, 1957 were evidently due to some mistake on the part of you or your underwriter.

As you know, a judgment against Tennessee Towing Company and me, individually, has been rendered in the United States District Court for the Middle District of Tennessee in the amount of $83,000 and costs, in favor of Clyde Keymon, one of the employees above referred to, on the ground that during the period when the vessel was at the Nashville Bridge Company for repowering and remodelling, he continued to be a seaman within the Jones Act; that the vessel was unseaworthy; and that his employer was guilty of negligence. We have appealed to the Court of Appeals for the Sixth Circuit. It will be necessary for a supersedeas bond to be filed or some other arrangement in lieu thereof, and on February 2, 1961, you informed Mr. Waller and me that your underwriter would not furnish this bond. That being the case, it is assumed that it adheres to the position previously taken, that it has no liability in the matter.

We were completely in your hands and feel that a court of equity would, under the circumstances, reform the endorsement in question so as to make it effective November 11, 1956. Hence we are enclosing the aforesaid check in the hope that your underwriter will reconsider and do so voluntarily and give you the neces-

sary authority to countersign the revised endorsement. *Falling* such voluntary action, we will take such legal action as may be necessary.

Even without the reformation of the aforesaid endorsement, it is our contention that your underwriter is in any event liable to the extent of $51,500, which you informed Mr. Waller was the coverage applicable to the John Luchow prior to the January 15, 1957 endorsement cancelling the John Luchow from the schedule. We have heretofore offered to reimburse you with any portion of the premium which was erroneously refunded to us on account of this cancellation, and this offer is hereby renewed. We also call to your attention that according to the testimony of the plaintiff, Clyde Keymon, Oakite was furnished him for use in cleaning the hold before the engine was removed. He testified that he used it three or four days before leaving Nashville on the Big Boy on November 14, 1956. Presumably no work was done on November 11, which was Sunday, or November 12, which was a holiday, and the payroll record shows that Keymon was absent both of those days. That being the case, the Oakite was, according to his testimony, furnished prior to November 11, so that the negligence on which the verdict was predicated,— requiring him to use Oakite without giving proper warning and instructions,—occurred prior to November 11. Hence your underwriter is responsible to the extent of $51,500 without regard to the endorsement of January 15, 1957.

As you have been previously informed, all papers of ours in connection with this matter had been lost or misplaced and we were not aware of the details and

dates above mentioned until you furnished them to Mr. Waller on November 26, 1960.

Yours very truly,

Cale P. Haun

CPH:km

Enclosure: Check—232.56

cc: Waller, Davis & Lansden

Richard, Scott & Lyle

Northwestern Fire & Marine Insurance Company

Mr. John L. Quinlan.''

(Collective Ex. 7, Dep. of M. T. White)

---

After the foregoing letter was written, Haun filed suit in Chancery Court at Nashville to have R.P.I. Policy 13622 reformed. Thereafter, considerable correspondence ensued between the Hunt Agency, Richards, Scott and Lyle, and the defendant, Hartford. As a result of this correspondence and also some oral discussions, the specific details of which need not be recited, Mr. H. W. Magenheimer, claims manager for Hartford, wrote the following letter to Haun, dated September 20, 1961:

''September 20, 1961

AIR MAIL

Mr. Cale P. Haun

West Tennessee Limestone Company

Wilson-Bates Building

3813 Hillsboro Road

Nashville, Tennesee

Dear Mr. Haun:

Re: M/V 'Luchow'

Personal Injury Claim

Clyde Keymon

Our File 57-5602

150

We refer to your letter of August 25, received on August 28, during the writer's absence from the office, relative to the above case.

This is to confirm your understanding that our letter to you of August 18 is an unqualified agreement on the part of Hartford Fire Insurance Company, for and on behalf of the Northwestern Fire & Marine Insurance Company (now Guaranty Securities Insurance Company) that both you and the Tennessee Towing Co. were assureds under the Northwestern Fire & Marine Insurance Co. Policy No. RPI 13622.

So there may not be any misunderstanding now or in the future, we should like to reiterate what the writer had said to you during his visit to Nashville in the presence of others and which we confirmed in our letter of August 18, that the underwriters on behalf of the Company mentioned above shall respond for loss, if any, subject to all of the terms and conditions of Policy No. RPI 13622 to the extent of the policy limits, namely, $51,500.

We trust that with these assurances you will now direct Mr. Waller to take appropriate action to dismiss the now pending suit against the Northwestern Fire & Marine Insurance Co. and/or Guaranty Securities Insurance Co., identified under rule No. 83087*.

It is the writer's understanding that the Appeal Case will be argued next month and we sincerely wish that Messrs. Waller's and Quinlan's arguments will prevail. If time permits the writer would like to attend

---

* This reference is to the suit in Chancery to reform the policy and does not refer to the instant case.

the arguments because of the importance of the issues involved.

With kindest personal regards.

Sincerely,
/s/ Henry Magenheimer
Claims Manager

HWm:ca
cc: Richards, Scott & Lyle
Nashville 3, Tenn.
Att: Mr. John W. Barker.''
(Collective Ex. 8 to Dep. M. T. White)

---

■ We consider this letter to be an unqualified agreement to indemnify Haun to the extent of $51,500.00 and not merely an offer to compromise, as insisted by the defendants.

The foregoing letter was written by Magenheimer in reply to Haun's letter of August 25, 1961, to Magenheimer as follows:

"Mr. H. W. Magenheimer
Claims Manager
Hartford Fire Insurance Company Group
Metropolitan Marine Department
123 William Street
New York 38, New York

Re:M/V 'Luchow'
Personal Injury Claim
Clyde Keymon
Your File 57-5602

---

152

Dear Mr. Magenheimer:

I am glad to have your letter of August 18, 1961, which I understand to be an unqualified agreement on the part of Hartford Fire Insurance Co., for and on behalf of Northwestern Fire & Marine Insurance Company (now Guaranty Securities Insurance Company), that Tennessee Towing Company and I were assureds under Northwestern Fire & Marine Insurance Company Policy No. RPI 13622 (erroneously referred to in your letter as No. RPI 13604). Unless you promptly advise me that this understanding is incorrect, I will instruct Mr. Waller to dismiss, without prejudice, at our cost, the suit in the Chancery Court at Nashville against Guaranty Securities Insurance Company (Rule No. 83087), in which one of the prayers for relief is that said policy No. RPI 13622 be reformed so as to specifically name Cale P. Haun and Tennessee Towing Company as assureds.

I share your hope that the Court of Appeals will reverse the District Court's judgment in the Keymon case, and I also hope that if the case is remanded for a new trial a compromise can be effected within the original policy limits of $51,500. If not, you understand, of course, that we reserve our right to contend that Guaranty Securities Insurance Company and/or Hartford Fire Insurance Co. are fully liable, for the reasons set forth in the aforesaid Chancery Court suit. I am sure you also understand that if the Keymon litigation is prolonged it may be necessary to reinstate the Chancery Court suit to avoid the running of the statute of limitations.

Thank you very much indeed for your invitation to call on Mr. Draper or you when I am in Hartford or New York.

Sincerely yours,

Cale P. Haun

CPH:mb

cc: Mr. William Waller Sr.

Mr. Billy Hunt.''

(Collective Ex. 8 Dep. M. T. White)

While Haun was pleased to receive assurance of coverage to the extent of $51,500.00, he still maintained that the defendants should be liable for the full amount of any judgment against him.

The judgment of the United States District Court against Haun and Tennessee Towing Company was later affirmed by the United States Circuit Court of Appeals and the total amount of such judgment and interest thereon was paid by Haun on March 27, 1962. At the time said judgment was paid it amounted to $91,196.25, which included interest.

On or about April 3, 1962, Haun made demand on the defendants for the payment of said sum of $91,196.25, together with costs and expense of litigation.

In reply to this demand by Haun, Hartford's New York counsel mailed him a draft for $51,250.00 on or about April 20, 1962. Haun refused to accept this draft and his counsel returned it to Hartford's New York counsel on or about April 24, 1962.

Thereafter, on May 7, 1962, the instant suit was filed in Chancery Court and thereafter tried before the Chancellor upon depositions and exhibits, as a result of which trial the Chancellor awarded the complainant a recovery

against the defendants for (1) the total amount of the United States District Court's judgment plus interest and costs, (2) the attorneys fees and expenses expended by Haun in defense of the Keymon suit and (3) twenty-five per cent statutory penalty.

This made a total of $155,590.60, for which latter amount the Chancellor awarded a decree in favor of complainant and against defendants, together with costs.

From the foregoing decree of the Chancellor the defendants have prayed and perfected their appeal to this Court and assigned errors as follows:

"1. The learned Chancellor erred in finding and/or holding that the complainant had, or was entitled to have, coverage against loss growing out of injury to the crew members of the 'Luchow' at the time Keymon sustained his injury.

2. The learned Chancellor erred in holding that the defendant by its letter to Mr. Haun dated September 20, 1961 (quoted on page 11 of the lower Court's Opinion), constituted an enforceable contractual agreement upon which the complainant can recover any amount in this litigation. That letter was an offer of compromise after the judgment had been obtained against the complainant in the Keymon case and the said offer was rejected, and therefore cannot be the basis of any liability in favor of the complainant against this defendant.

3. The learned Chancellor erred in finding and holding the defendant liable on any contractual basis and/or liable for any bad faith on the basis of statements made either in the letter of C. M. Hunt Company to Richards, Scott & Lyle dated February 3, 1958, written

subsequent to the institution of the Keymon suit in the District Court in Nashville, and/or the letter from an employee of Richards, Scott & Lyle to defendant dated April 21, 1961, written many months after the Keymon judgment, which were nothing more nor less than an exchange of views between representatives of the defendant, and the defendant, and not in any way contemporaneous with the facts complained of by the complainant upon which the liability of the defendant is asserted.

4. The learned Chancellor erred in failing to hold that in no event could the defendant's liability exceed $25,000.00, inasmuch as the complainant could have settled the Keymon case for that amount and failed to do so even though defendant insurance company approved it and urged it.

5. The learned Chancellor erred in failing to hold that the River Policy upon which the alleged coverage was based, as an 'indemnity policy', under the terms of which the defendant was not legally obligated to provide a defense for the assured, even if coverage existed, and therefore the defendant could not be held liable in excess of the face amount of said policy because of 'bad faith' or breach of a contractual duty in failing to provide such legal defense.

6. The learned Chancellor erred in failing to hold that the defendant could not be found guilty of 'bad faith' or a failure in its 'contractual duty' in failing to provide for a defense of the Keymon case in the Trial Court, inasmuch as, at the time suit was instituted and tried, neither defendant in said Keymon case was a named assured in the River Policy involved.

7. The learned Chancellor erred in holding that the Statutory penalty of twenty-five percent was applicable in this case.

8. The learned Chancellor erred in holding that the defendant was liable for the amount of the Keymon judgment plus interest and cost.

9. The learned Chancellor erred in holding that the defendant was liable for attorney's fees and expenses expended by the complainant in the defense of the Keymon case.

10. Complainant is judicially estopped to assert an alleged subjective intent for defendant's River Policy to cover the crew while the Luchow was at the Bridge Co., it being repugnant to his sworn testimony in the Keymon trial that he intended for them to be covered by his Longshoremen's policy written by INA, and the Chancellor erred in failing to so hold."

We will not discuss these assignments separately, but we have considered all of them and reached the following conclusions:

The first question which we must determine to our own satisfaction is whether or not RPI Policy 13622 is an indemnity policy or a policy of liability insurance. In this connection, we note that the letters "RPI" preceding the policy number designate it as a "River Protection and Indemnity Policy."

In the case of Finley v. U. S. Casualty Co., 113 Tenn. 592, 83 S.W. 2 (1904), the Supreme Court of this State had occasion to consider an indemnity policy and said:

"There are some parts of the policy copied in this opinion that are apparently, on first consideration, out

of harmony with the view that the contract was intended as one of indemnity merely against loss from liability for damages, rather than against liability simply. We refer to the second and third paragraphs, under the caption 'General Agreements.' Similar terms were referred to in Fenton v. Fidelity & Casualty Co., supra, [36 Or. 283, 56 P. 1096] as indicating that the contract was one simply against liability. This construction is very suggestive, and, if the clauses referred to stood alone, it would be difficult to assign any other meaning to them. However, they are qualified and controlled by the seventh special agreement. When construed along with the latter provision, the following is observed to be the meaning: While the company is bound to reimburse the assured for loss actually sustained and paid by him in satisfaction of a judgment recovered against him by an employé, yet, in order to make sure, as far as possible, there shall be no recovery as a basis on which to subsequently establish a claim, the company reserves the right to defend the litigation; also to supervise any settlement that may be made, and to have a free hand in negotiating settlements of a claim made against the assured. As stated, if these provisions—that is, the second and third general agreements—stood alone, they would furnish strong reasons for construing the contract as one against liability; but, from what has just been stated, it is perceived that they have a proper place in a contract against loss from liability for damages, in the way of enabling the company to minimize the loss.

When we consider that the provisions in the outset of the policy is 'to indemnify against loss * * * from * * * liability for damages, and that in the seventh general

agreement is provided 'that no action shall lie against the company as respects any loss under this policy, unless it shall be brought by the assured himself to reimburse him for loss actually sustained and paid by him in satisfaction of a judgment,' etc., we think there can be no doubt that this policy must be construed as one belonging to the class of policies furnishing indemnity against loss from liability for damages, rather than as being a contract insuring against liability simply.''

Finley v. U. S. Cas. Co., supra, pp. 602, 603, 604, 83 S.W. p. 4.

■ While Finley v. Casualty Company is an old case (1904) it does not appear to have been overruled and therefore, it is still the law in this State and we conceive it to be our duty to follow the opinion in that case in deciding whether or not the policy in the instant case is one of liability or indemnity.

This rule of construction was followed in the later case of Teters v. Gass, 156 Tenn. 127, 299 S.W. 788 (1927). The language of the contract in the instant case is perhaps even more clearly that of indemnity against loss only, than that found in the contract under consideration in Finley v. Casualty Co., supra. There it read "against loss from common law or statutory liability for damages," etc. Here it reads: "such sums as the assured * * shall have become legally liable to pay *and shall have paid.* * * *'' The words italicized by us indicate a purpose to emphasize the restriction to indemnity only.

The policy under consideration here provides for payment up to the amount of the policy limits of "such sums as the assured, as owner of the (as per schedule)

shall become legally liable to pay and shall have paid on account of : Loss of life of, or injury to, or illness of, any person; Hospital, medical or other expenses necessarily and reasonably incurred in respect of loss of life of, injury to, or illness of any member of the crew of the vessel named herein.''

(Ex. 1 to 17, Barker's testimony)

The policy does not provide that the insurer shall be required to represent the insured in any suit filed against the insured, but it contains instead the following provision:

"This Company shall have the option of naming the attorneys who shall represent the assured in the prosecution or defense of any litigation or negotiations between the assured and third parties concerning any claim covered by this policy, and shall have the direction of such litigation or negotiation.''

We have examined the case of Cayard v. Robertson & Hobbs, 123 Tenn. 382, 131 S.W. 864 (1910), cited by complainant's counsel and find it has no application to the instant case.

Therefore, we have concluded that the policy upon which recovery is sought here is one of indemnity rather than one insuring against liability.

In several Tennessee cases, recovery has been awarded in favor of the insured and against the insurer for amounts in excess of policy limits of liability insurance policies. Southern Fire & Gas Co. v. Norris, 35 Tenn. App. 657, 250 S.W.2d 785 (1952); Tennessee Farmers Mutual Ins. Co. v. Hammond, 43 Tenn.App. 62, 306 S.W. 2d 13 (1957).

160

However, it appears that recovery in such cases for amounts in excess of policy limits has been grounded upon the principles that an insurer assuming under its policy to control litigation against the insured must act in good faith and with reasonable diligence and caution; that the relationship between such an insured and his insurer under a liability policy is one of trust calling for reciprocity of action in that the insured owes the duty of full cooperation and the insurer owes the duty of exercising good faith and diligence in protecting the interest of its insured.

Since the policy under consideration here is one of indemnity and not a policy of liability insurance, such as the standard policy of liability insurance issued to owners and operators of motor vehicles, no obligation arises on the part of the insurance company under such an indemnity policy to defend the suit against the insured and no relationship of trust arises requiring the insurer to exercise any function in protecting the interest of its insured, except to reimburse the insured for loss sustained and paid by the insured, provided such loss is covered by the terms of the policy of indemnity.

In the instant case, counsel selected by the insured had control of the litigation and the negotiations for settlement and therefore, no obligation rested upon the insurer to protect the insured against such loss, other than to indemnify and reimburse him upon payment of such loss.

It is argued that under the language of the policy, the insurer had the direction of the litigation and negotiations and reference is made to the following language of the policy: "and shall have the direction of such litigation or negotiations."

However, this language is part of a single sentence, which we have heretofore quoted in its entirety. The language is not ambiguous and it simply means that if the insurer exercises its option of naming the attorneys who shall represent the insured in the litigation or negotiations between the insured and third parties concerning any claim covered by the policy, then in that event, the insurer shall have the direction of such litigation or negotiations.

There is also some competent evidence in the record as to the customary practice in handling claims arising under Marine Indemnity policies such as that under consideration here. Mr. Quinlan qualified as an expert on marine insurance and he testified as follows:

"Q. You mean it's the usage and custom to leave it up to the insured to defend his own case, handle his own case, defend it and then apply to the company for indemnification?

A. The assured selects his own counsel. The insurer probably is aware of whom he is selecting. If the assured selects counsel to represent him that is knowledgeable in marine and defense work, the insurer doesn't do a thing, but if the assured picks some relative or friend or someone whom he'd like to earn a fee, who knows nothing about marine, the insurance company will say, 'We want you to retain so and so.' The insurance company won't retain the counsel. They will tell the assured to retain certain counsel as its counsel. They have the option of naming the counsel that the assured shall retain. If our firm or one of the big marine defense firms in the city is named, none of the insurance companies ever exercises the option.

Q. So then it is the practice, usage and custom to give full effect to the policy language and leave it to the insured to defend the claim against him, to settle it or if he tries it and loses it, in either event then to call upon the company for a reimbursement and indemnification?

A. At that point. When the matter is all concluded, then the assured makes up a statement which would contain all expenses that he has expended, what he may have paid in settlement or by way of settlement or by way of counsel fee amount like and submit it to the company for reimbursement.''

(Dep. of John L. Quinlan, pp. 47, 48)

Mr. Richard M. Noack, also qualified as an expert on marine insurance and he testified as follows:

''Q. But now as a claim agent, briefly what did you do for the steamship company?

A. I settled all major claims, personal injuries, cargo collision, mail, anything that came along that looked like a claim plus safety work, a knowledge of the insurance arrangements that the company had.

Q. Even where the company was insured, would you settle the claims and call upon the company to reimburse or indemnify you?

A. Yes, we settled the claims in the first instance just as if we were uninsured unless the amounts for insurance—I would get approval to lay the groundwork for recovery claim against them.

Q. Was that unusual with you or was that then the established practice and usage in the marine industry?

A. I would say it was general practice."

(Dep. Richard M. Noack, pp. 101, 102)

Therefore, we have concluded that it was error for the Chancellor to enter a decree against the defendants for the entire amount of the judgment obtained against Haun in United States District Court, together with expense of litigation.

Each party insists that the other had an opportunity to settle the Keymon case for $25,000.00, but after considering the evidence in the record on this aspect of the case, about the only conclusions we can reach from such evidence are as follows:

(1) That at one time, Keymon's counsel said they would be willing to recommend that their client settle his claim for $25,000.00 and, (2) there was some discussion between Mr. Quinlan and a representative of another insurance company that carried Haun's Longshoremen's insurance about settling the Keymon case for $25,000.00 with each insurer paying one-half of such amount, provided it could be settled, but the other insurer refused to participate in such proposed settlement.

There is no evidence that Keymon's counsel ever recommended to him that he settle for $25,000.00 or that he ever agreed to settle for that amount or for any specific amount.

Consequently, we have concluded there is no merit in the contention of either of the parties that the other had the opportunity to settle the Keymon case for $25,000.00.

Defendants insist that the complainant is judicially estopped to assert that it was his intention for the River Protection Indemnity Policy to cover the Luchow crew

while the vessel was docked at the Nashville Bridge Company and counsel refer to certain testimony of Haun in the trial of the Keymon case in United States District Court.

We have considered this testimony and when it is considered by us in the light of all the facts and circumstances of the case and the evidence which was presented upon the trial of this case in the Chancery Court, we do not conclude that Haun, by his testimony in the trial of the Keymon case, estopped himself to claim coverage under the River Protection and Indemnity Policy.

As we have heretofore said, we consider the letter written by Magenheimer to Haun on September 20, 1961, which is hereinbefore quoted in its entirety, to be an unqualified agreement to indemnify Haun and therefore, the defendant is liable to complainant for the full amount of the policy limits of $51,500.00 after subtracting the deductible amount of $250.00 from such policy limits.

However, we do not agree with the Chancellor's conclusion that the complainant is entitled to recover a statutory penalty under the terms and provisions of T.C.A. sec. 56-1105 which is as follows:

"56-1105. *Additional liability upon insurers for failure to pay promptly insurance losses when refusal is not in good faith.*—A. The insurance companies of this state, and foreign insurance companies and other persons doing an insurance business in this state, in all cases when a loss occurs and they refuse to pay the same within sixty (60) days after a demand shall have been made by the holder of the policy on which said loss occurred, shall be liable to pay the holder of said policy, in addition to the loss and interest thereon, a

sum not exceeding twenty-five per cent (25%) on the liability for said loss; provided, that it shall be made to appear to the court or jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury upon the holder of said policy; and, provided, further, that such additional liability within the limit prescribed shall in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury thus entailed.

B. In any action against an unauthorized foreign or alien insurer upon a contract of insurance issued or delivered in this state to a resident thereof or to a corporation authorized to do business therein, if the insurer has failed for thirty (30) days after demand prior to the commencement of the action to make payment in accordance with the terms of the contract, and it appears to the court that such refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action. Such fee shall not exceed twelve and one-half per cent (12½%) of the amount which the court or jury finds the plaintiff is entitled to recover against the insurer, but in no event shall such fee be less than twenty-five dollars ($25.00). Failure of an insurer to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause."

It will be noted that under the provisions of subsection "A" of this Section an essential prerequisite to imposition of the penalty is the provision that "in all cases when a loss occurs and they refuse to pay the same

within sixty (60) days after a demand shall have been made by the holder of the policy on which said loss occurred."

■ This sub-section obviously has no application to the facts of the instant case since, within less than thirty days after Haun made demand upon the defendant to pay the judgment in the Keymon case, defendants' counsel sent him a draft in the amount of $51,250.00, which, in our opinion, constituted the entire obligation of the defendant to Haun at that time.

Haun refused to accept this draft and returned it and therefore, the complainant is in no position to seek recovery of the twenty-five per cent penalty.

■ Neither is sub-section ''B'' of the foregoing Code Section applicable so as to invoke imposition of a twelve and one-half per cent penalty, because of the fact that the defendant offered to pay Haun within less than thirty days after demand for payment.

Consequently, we hold that it was error for the Chancellor to award a recovery of any penalty under T.C.A. sec. 56-1105.

After a consideration of all of the facts and circumstances appearing in the evidence in this case and the legal authorities cited by counsel for the respective parties, we have concluded that the Chancellor's decree should be modified and a judgment should be entered here in favor of complainant and against the defendant, Hartford, for the sum of $51,250.00 together with interest from March 27, 1962, which is the date upon which Haun paid the judgment rendered against him in the Keymon case.

Assignments of error numbered one, two, four and ten are overruled. Assignments numbered five, six, seven, eight and nine are sustained. That portion of assignment numbered three wherein the defendant insists that the Chancellor erred in finding and holding the defendant liable on any contractual basis is overruled, but that portion of such assignment three insisting that the Chancellor erred in holding the defendant liable for lack of good faith is sustained.

A judgment will be rendered here for the sum of $51,250.00 plus interest in the amount of $23,062.50, thus making a total of $74,312.50, for which judgment will be rendered here in favor of complainant and against defendant Hartford Fire Insurance Company, together with all costs incurred in the Chancery Court.

The costs of this appeal will be borne equally by the parties, that is the complainant will pay one-half thereof and the defendant Hartford Fire Insurance Company, will pay the other one-half thereof.

Shriver, P. J. (M.S.), and Todd, J., concur.

OPINION ON PETITION TO REHEAR

PURYEAR, J. The defendant has filed a very earnest petition to rehear in which it insists that it should be relieved of the burden of paying interest on $51,250.00 of the amount awarded to complainant, since this amount was tendered to complainant on April 20, 1962, which was less than thirty days after Haun paid the judgment rendered against him by the United States District Court and affirmed by the Circuit Court of Appeals.

It is correct, as we stated in our original opinion, that on or about April 20, 1962, defendant's counsel sent Haun

a draft for $51,250.00, which was returned by him to the defendant. However, Haun was demanding payment of $91,196.25 plus attorneys' fees and other costs and this demand was well known to defendant at the time it sent such draft to Haun.

The draft sent to him by defendant contained language, on the reverse side thereof, which would make the acceptance and indorsement of such draft a full and complete release of Haun's entire demand. Therefore, the tender was conditional.

At no time thereafter did the defendant make an unconditional tender of said sum of $51,250.00 and neither did the defendant tender or offer to pay said sum into Court after suit was filed.

■ Generally speaking, a tender, in order to be effective, must be absolute and unconditional. Vol. 86, C.J.S. Tender sec. 32, pp. 573, 574; Sinard v. Harris, 2 Higgins 486.

In Ingold v. Phoenix Assur. Co., 230 N.C. 142, 52 S.E. 2d 366, 8 A.L.R.2d 1439 (1949), the Supreme Court of North Carolina said:

"It is the universal rule that in order to constitute a valid and effectual tender of money admitted to be due, the party who makes it must allege and show that since the refusal to accept the money he has always been ready to pay the same, and must bring the amount of the tender into court."

Supra, 52 S.E.2d at p. 370, 8 A.L.R.2d at p. 1444.

Defendant cites Gracy v. Potts, 63 Tenn. 395, in support of its insistence that it was not necessary to tender said sum of $51,250.00 into Court, but that question was

apparently not raised in that case, because it is not discussed in the opinion.

Also in that case the tender made before suit was unconditional and was made in confederate money in 1862, at which time no objection was made to this currency. The tender was refused because plaintiff was in the army and did not need the money. When suit was brought in 1865 for United States money it would have been idle ceremony to keep the original tender alive by paying confederate currency into Court, because it was worthless. So Gracy v. Potts, supra, is not controlling.

Defendant also cites Tenn. Farmers Mutual Ins. Co. v. Cherry Admr. (1963), 213 Tenn. 391, 374 S.W.2d 371, to which we referred in our original opinion.

We stated in our original opinion that the Cherry case was not applicable to the instant case. After reconsidering that case we do not consider the holding therein as supporting the defendant's insistence that it is not liable for interest.

The holding in Pennsylvania Lumbermens Mut. Fire Ins. Co. v. Holt, (1949), 32 Tenn.App. 559, 223 S.W.2d 203, seems to settle the question of defendant's liability for interest in this case. The opinion in Holt, supra, applied to three consolidated cases, which involved liability of the defendant, Pennsylvania Lumbermens Mut. Fire Ins. Company to the plaintiffs, Thomas M. Holt and Mrs. E. L. Holt, upon three contracts of fire insurance. One of the questions raised therein was liability of the insurance company for interest. In disposing of that question, this Court, in an opinion by the late Judge Howell, said:

"The defendant also insists that it is not liable for interest. It claims a tender before the suit was filed and filed a plea of tender and paid that amount into court with its plea. We find that this tender was not unconditional in that the amount was tendered in full settlement of the liability of the defendants under all the contracts sued upon. This tender was not sufficient to avoid liability for interest. In the case of Phoenix Ins. Co. v. Jordan et al., 28 Tenn.App. 11 on page 29, 184 S.W. 2d 721, on page 728, in an opinion by Hickerson, Judge, this Court said:

'There remains only the question of the allowance of interest. Code, Section 7305 provides: "Demands bearing interest.—All bonds, notes, bills of exchange, and liquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specific time therein mentioned."

'Under this section courts are compelled to allow interest in all cases which come within its terms. Nickey Bros. v. Lonsdale Mfg. Co., 149 Tenn. 391, 258 S.W. 776. In People's Bank & Trust Company v. United States Fidelity & Guaranty Company, 156 Tenn. 517, 3 S.W.2d 163, 164, our Supreme Court said: "A policy of life insurance falls within this section and bears interest from the time it becomes due and payable. The allowance of interest is imperative. Knights of Pythias v. Allen, 104 Tenn. 623, 58 S.W. 241. Fire insurance policies, accident insurance policies, and other insurance contracts proper would come under this section of the Code." ' "

■ The $51,250.00 was due immediately after Haun paid the judgment and during all of this period of time from April 20, 1962, until the present date, the defendant has retained the use of said sum of money, whereas, if it had been paid into Court within a reasonable time after suit was instituted, such sum would have been earning interest, which interest would have been awarded to complainant upon final termination of the litigation.

It is indeed surprising, in these days of high interest rates, that the defendant would complain about paying six percent interest on this sum of money which it has been permitted to retain all of this time.

After carefully considering said petition to rehear, the brief and argument filed in support thereof, and the authorities cited, the petition is respectfully denied.

Shriver, P. J. (M.S.), and Todd, J., concur.